653 So.2d 215 (1995)
Gerald W. McKENZIE, Plaintiff-Appellant,
v.
WEBSTER PARISH SCHOOL BOARD, Defendant-Appellee.
No. 26713-CA.
Court of Appeal of Louisiana, Second Circuit.
April 5, 1995.
Rehearing Denied May 4, 1995.
*216 Jon K. Guice, Monroe, for appellant.
Patrick M. Amedee, Joseph M. Bertrand, New Orleans, for appellee.
Before NORRIS and HIGHTOWER, JJ., and CULPEPPER, J. Pro Tem.
CULPEPPER, Judge Pro Tem.
Plaintiff, Gerald W. McKenzie, appeals a judgment in favor of defendant, Webster Parish School Board (School Board), in plaintiff's action for alleged wrongful termination. McKenzie, a probationary teacher, asserts his termination violated LSA-R.S. 17:391.5 and the School Board's own policies. Because the School Board complied with LSA-R.S. 17:391.5 and substantially complied with its policies pertaining to evaluation, assessment, remediation and dismissal of probationary teachers, we affirm.

FACTS
The School Board hired McKenzie in August 1985 to serve as a high school social studies teacher and coach at Sarepta High School. McKenzie taught under a series of *217 one year "probationary" contracts until May 1988. From August 1985 to May 1988, McKenzie was evaluated sixteen times by Fulton Jones, the principal, and Cleve Strong and Ray Burnham, supervisors of secondary education.
On June 6, 1988, McKenzie was notified by letter that his contract would not be renewed due to his inability to improve his "classroom management techniques." In a letter dated June 20, 1988, the principal recommended to the superintendent that McKenzie's contract not be renewed because of his low evaluations. On July 5, 1988, the superintendent informed McKenzie by letter that the superintendent would recommend to the school board his contract not be renewed because of deficient classroom management. On July 25, 1988, the School Board elected not to renew McKenzie's contract.
McKenzie sued the School Board asserting wrongful termination, violation of the state accountability statutes and failure to abide by the School Board's policy on evaluation, remediation and termination. The School Board filed a motion for summary judgment which was granted by the trial court. On appeal, this court held McKenzie's termination was governed by LSA-R.S. 17:442 and found the School board did not abuse its discretion. However, this court went on to hold LSA-R.S. 17:391.5(C) did apply to probationary teachers and remanded the case to the trial court for a determination of whether McKenzie's evaluation and dismissal were proper under LSA-R.S. 17:391.5 and the School Board's policies. For a detailed exposition of the facts and procedural history see this court's opinion McKenzie v. Webster Parish School Board, 609 So.2d 1028 (La. App. 2d Cir.1992).
At the second trial, McKenzie testified that Cleve Strong, supervisor for secondary education, observed his class during the 1985 school year. In October 1985, Mr. Strong indicated on the observation and evaluation sheet: "Discipline is not bad, but class control will pay off later on." In December 1985, Strong wrote McKenzie did not show enough enthusiasm for teaching and suggested he stand and move around the room while teaching.
On May 13, 23, 28, 1986, Fulton Jones, the principal, observed McKenzie's class. On May 13 and 23, Jones noted some students were not involved in the lesson and were working on other projects. On May 28, Jones wrote: "Mr. McKenzie was administering a test in free enterprise class. He moved from desk to desk observing the students work. The class was quiet and orderly."
The evaluation forms discussed thus far did not provide for a rating to be given to the teacher. The evaluations forms were changed in 1986 to provide the evaluators an opportunity to rate the teacher as satisfactory, needs improvement or unsatisfactory.
In November 1986, Jones evaluated McKenzie using the new form. Under the heading "Establishes and Maintains Class Control in an Atmosphere Conducive to Learning" Jones circled needs improvement and noted too little classroom control. In all other areas Jones rated McKenzie satisfactory and gave him and overall rating of satisfactory. In February 1987, March 1987, May 1987, May 1988, McKenzie received identical evaluations from Jones. Each evaluation sheet reflects McKenzie received a satisfactory rating in every category except classroom control which was noted as needs improvement. McKenzie's overall rating was satisfactory. On April 25, 1988, Jones gave McKenzie a satisfactory rating in every category including classroom control. On April 27, 1988, Jones rated McKenzie satisfactory in every category, but gave him a needs improvement on the overall rating and wrote to the side "in discipline."
McKenzie also recalled being observed by Mr. Ray Burnham. In October 1986, Burnham documented McKenzie needed to improve his overall positive attitude. Burnham wrote: "Discipline good, but class not very conducive to learning. Absolutely no life in presentation." Burnham also noted McKenzie needed improvement in lesson planning and teaching. Burnham gave McKenzie an overall rating of needs improvement. In October 1987, Burnham rated McKenzie satisfactory in every category except classroom control in which he gave McKenzie a needs *218 improvement. The overall rating was satisfactory. In February 1988, Burnham again noted McKenzie needed improvement in lesson planning and the use of various instructional methods. Class control was given a satisfactory rating, but the overall rating was needs improvement. In March 1988, Burnham again noted McKenzie needed improvement in class control, lesson planning and instruction of the students and gave McKenzie an overall rating of needs improvement. McKenzie testified he was never given an Assistance Schedule, never given a deadline to improve his classroom control and was never told the School Board was invoking an assistance program.
Cleve Strong testified that he gave McKenzie the observation sheet but was not familiar with an assistance schedule. During the cross examination of Mr. Strong, the defense stipulated that Mr. McKenzie was never given an assistance schedule.
Ray Burnham testified that following his observation of McKenzie he informed him of the areas in which he should work to improve and suggested strategies and techniques to help him. Burnham testified his observations revealed more severe problems than the observation of Jones; however, the two never documented their differences of opinion concerning McKenzie. Burnham also admitted the observation form is distinct from the assistance schedule and that no professional assistance schedule was prepared to help remediate McKenzie.
Fulton Jones testified he observed McKenzie on several occasions and gave him a satisfactory rating on almost every occasion. Jones stated that although McKenzie received a satisfactory rating, classroom control was an ongoing problem. Jones also admitted no assistance schedule was prepared for McKenzie.
Ralph Rentz, personnel director, testified McKenzie was given a remediation plan, pursuant to School Board policy, every year he taught. However, during his pre-trial deposition, Rentz testified that no remediation plan was ever given to McKenzie. Rentz admitted a "formal" assistance schedule was not prepared. It was Rentz's position that the evaluation and observation forms were sufficient to comply with School Board policy.
Finally, Jerry Lott, the superintendent, testified no assistance schedule was prepared for McKenzie because the information was contained in other documents. Burnham, Rentz and Lott testified that the use of the assistance schedule was a formality and McKenzie received sufficient remediation through the observations and evaluation.

DISCUSSION
The issue before this court is whether the School Board complied with LSA-R.S. 17:391.5 and its own policies pertaining to evaluation, remediation and dismissal of probationary teachers.
Initially, we note discharge of probationary teachers is governed by LSA-R.S. 17:442 which provides in pertinent part:
Each teacher shall serve a probationary term of three years to be reckoned from the date of his first appointment in the parish or city in which the teacher is serving his probation. During the probationary term the parish or city school board, as the case may be, may dismiss or discharge any probationary teacher upon the written recommendation of the parish or city superintendent of schools, as the case may be, accompanied by valid reasons therefor.
The reasons for dismissal of a probationary teacher are committed to the sound discretion of the school board, and unless the teacher can clearly show the board abused its discretion, the court will not interfere. The discretion given to the school board in discharging, for valid reasons, teachers during their probationary terms is for the purpose of weeding out personnel whose attitude or performance, while not so flagrantly faulty as might be required for the discharge of a tenured teacher, indicates that it is undesirable for reasons of efficiency or harmony, among others, to grant them permanent status as members of our professional educational force. The term "valid reasons" means "sound and sufficient reasons" Ford v. Caldwell Parish School Board, 541 So.2d 955 (La.App. 2d Cir.1989).
*219 In Gaulden v. Lincoln Parish School Bd., 554 So.2d 152 (La.App. 2d Cir.1989), this court held that when the issue is incompetence, LSA-R.S. 391.5 applies and should be complied with before dismissal proceedings are initiated under LSA-R.S.6 17:442. (Erroneously referred to as LSA-R.S. 17:443.) However when the complaint is one of willful neglect of duty or dishonesty, there is no application of Sec. 391.5.
At the time of Mr. McKenzie's dismissal LSA-R.S. 17:391.5(C) provided:
No later than August 15, 1978, each school board shall adopt a system of personnel evaluation and assessment based on the guidelines submitted by the superintendent of education. Evaluation and assessment of the performance of each certified employee shall be made on a continuing basis, at least once each year for probationary personnel, and at least every third year for personnel with permanent status. The evaluation shall consist of an appraisement of the performance of the employee in the extension of teaching duties and responsibilities. In the event an employee is considered not performing his duties in a satisfactory manner then the employing authority shall notify the employee in writing of such determination and describe such nonperformance. The employing authority shall thereafter confer with the employee making specific recommendations as to areas of considered unsatisfactory performance of the employee and assist him to correct such considered deficiencies within a prescribed period of time. Assistance may include but not be limited to in-service training programs or such other appropriate programs.
The statute requires: (1) the adoption of a system of personnel evaluation (2) evaluation and assessment of certified employees at least once a year (3) written notification of unsatisfactory performance (4) conferences between the employer and employee concerning the unsatisfactory areas and recommendations to correct deficiencies in a prescribed period of time.
The record reflects the School Board adopted a system of evaluation, evaluated McKenzie yearly, notified him in writing of his deficiency, and conferred with him in an attempt to correct his deficiencies. McKenzie asserts the School Board failed to abide by the law because they did not inform him of the prescribed period of time in which McKenzie was required to improve. Initially we note the statutory writing requirement does not apply to the phrase "prescribed period of time." The only item required to be in writing is the notice of deficiency. Secondly, we see no injustice in requiring a probationary teacher with a one year contract to understand the time period for improvement is one year, or in any event, sometime prior to the completion of his contract. After reviewing the record on appeal, we hold the School Board complied with the mandates of LSA-R.S. 17:391.5.

SCHOOL BOARD POLICIES
The second issue before this court is whether the School Board complied with its own policy of evaluation, assessment, remediation, and dismissal. The School Board was free to construct an evaluation and assessment program within the broad parameters of LSA-R.S. 17:391.5. The School Board is given great discretion in fashioning, adopting and implementing its plan and the standard of review used by courts when called upon to review whether a school board complied with its own policies is substantial compliance. Harris v. West Carroll Parish, School Board., 605 So.2d 610 (La.App. 2d Cir.1992).
The portions of the policy which McKenzie asserts the School Board failed to comply with provide:
Sec. 6.4B. Any employee receiving less than satisfactory as an overall rating will have assistance prescribed as explained in subsection 6.5
Sec 6.5C provides:
More than one opportunity will be provided to improve the skills of an employee who has been evaluated as less than satisfactory. After multi-opportunities have been prescribed and re-evaluation has occurred, continued unsatisfactory performance shall result in recommendation for dismissal; such recommendation to be in *220 compliance with policy and procedures of the Webster Parish School Board.
The professional assistance program shall be planned by the evaluator and/or observers and recorded on a professional assistance program schedule form. The activities shall be prescribed, the time period established, and date for re-evaluation determined. The assistance schedule will be signed and dated by evaluatee and evaluator and/or observers at the conference for presenting the schedule to the evaluatee and again at the post evaluation conference when assistance has been offered. If the evaluatee shows non-improvement the dismissal process is started.
McKenzie points to the failure of the School Board to utilize the professional assistance form as proof of the School Board's failure to abide by its policies. Admittedly, this form is distinct from the evaluation form and everyone who testified at trial admitted it was not used. McKenzie's reliance is misplaced. Although the evaluators did not use this particular form, McKenzie was given repeated written notice in the observation and evaluation forms concerning his deficiencies in classroom control and written recommendations by experienced educators on how to remedy the problem. McKenzie also asserts the School Board failed to give him the required notice concerning "the prescribed period of time" for improvement. Although the record reflects the School Board did not prescribe a time within which improvement must occur, any reasonable probationary teacher should have known the types of deficiencies noted were required to be corrected immediately. Deficiencies such as classroom control, discipline, lesson plans, more enthusiasm, speak loudly, involve more students in discussion, get up from behind your desk and teach and better preparation, do not require deadlines. The requirement of deadlines would apply to such things as seminars, workshops, further course study and similar improvements in a teacher's specialty.
In Harris, supra, this court reviewed the trial court's ruling that the School Board had substantially complied with its policy for terminating nontenured employees. This court held that when a school board complied with six of the seven procedures set forth in its own policy and substantially complied with the seventh, it had substantially complied with its own policy and this court would not overturn the trial court's ruling. In the case sub judice the School Board's policy required multiple opportunities to improve, re-evaluation, professional assistance, notice of the deficiencies, and the establishment of a time period for improvement. The School Board gave McKenzie two years and nine months to improve his classroom control. The School Board evaluated McKenzie sixteen times over the three year period. Furthermore, three highly qualified educators provided McKenzie with written recommendations and suggestions for improvement. The only procedures the School Board failed to strictly comply with were the use of a particular professional assistance form and the setting of a deadline for improvement. As noted above, all of the information that would have been contained in the professional assistance form was contained in the written evaluations, and the fixing of deadlines was not appropriate for the types of deficiencies noted.

DECREE
For the foregoing reasons, we affirm the judgment appealed. Costs are assessed against the appellant.
AFFIRMED.
NORRIS, Judge, dissenting.
I respectfully dissent. As correctly stated in the majority opinion, the issue before this court is whether the School Board complied with the provisions of La.R.S. 17:391.5 and its own policy mandated thereby pertaining to evaluation, remediation and dismissal of probationary teachers.
This record clearly demonstrates that the School Board made little or no effort to comply with its statutorily mandated evaluation policy. When a School Board fails to honor its own policy for dismissing or terminating a nontenured teacher, a wrongful termination occurs. Easterling v. Monroe City School Bd., 612 So.2d 975 (La.App. 2d Cir. 1993). Because the majority's finding of "substantial" compliance entails a less than *221 thorough analysis of the matter, I will take this opportunity to review the applicable law and facts in some detail before stating my conclusions.
Mandatory State law. In the first place, the School Board was mandated by La.R.S. 17:391.5 (since repealed) to adopt a system of personnel evaluation and assessment based on guidelines submitted by the Superintendent of Education. The evaluation policy was to be for each certified employee on a continuing basis. Evaluation for probationary personnel was required to be made at least once each school year and consist of an overall appraisement of his performance. If the evaluation resulted in an unsatisfactory rating, then the employing authority must notify the employee in writing and describe the area or areas of unsatisfactory performance. The employing authority then must confer with the employee, making specific recommendations for improving his problem areas and assisting him to correct his deficiencies within a prescribed time frame. Another statute, R.S. 17:24.3 (also since repealed) reiterated these requirements and mandated that teachers were to be assured of due process in all aspects of the evaluation procedures.
The School Board's policy. Pursuant to these statutes, the Webster Parish School Board adopted a comprehensive plan of uniform personnel evaluation. Entered in this record as Exhibit J-2, it conforms to state law.
Specifically, the policy states (§ 6.0) that the principal is the person responsible for evaluating a teacher; that a nontenured teacher is to be evaluated at least once a year for a three-year period; a final evaluation determining an overall rating of the teacher's performance is to be made each year prior to the post-evaluation conference; and evaluations are to be recorded on the prescribed form designated as PA-2/3 (§ 6.2), and a copy furnished to the teacher. No evaluation is to be based on fewer than three observations.
Notably, there is a distinct difference between an observation and anevaluation. Under § 3.0, an observation is the process of gathering facts, noting occurrences, and documenting evidence of performance that must be utilized in compiling the evaluation report. Observations are made by a supervisor based on periodic classroom visits. An evaluation is the process of making considered judgments concerning the professional accomplishments and competency of a certified employee based on a broad knowledge of the area of performance involved, the characteristics of the person being evaluated, and the specific standards of performance preestablished for the position. The principal is the person authorized to make an evaluation; he also has the duty to observe teacher performance in accord with the policy. Any differences in opinion between observation reports are to be reconciled by the personnel director in conference with the observers and the Assistant Superintendent.
Any teacher receiving an unsatisfactory evaluation is entitled to assistance prescribed as detailed in § 6.5 of the policy. Multiple opportunities for assistance must fail before a recommendation of dismissal is appropriate. This professional assistance program shall be planned by the evaluator and/or observers and recorded on a special form designated as the Professional Assistance Program Schedule Form (PA-2/3a). The activities for assistance shall be prescribed, the time period established therefor, and a specific date set for reevaluation established. It is only after multiple opportunities for assistance or remediation have been provided and reevaluation has occurred, that continued "unsatisfactory" performance will result in recommendation for dismissal.
McKenzie's evaluation history. During the 1985-86 school year, McKenzie was observed by secondary supervisor Cleve Strong on October 1 and December 17, 1985. Strong admittedly suggested means of improvement: get the whole class's attention by involving all students in the discussion, and use ways to make class activity more exciting (10/1); be careful with personal opinion, stick to topic with openmindedness, carry on instruction while standing and moving about the room (more effective talking while standing than while seated), get students all together (12/17). Principal Jones also observed McKenzie during this school year on *222 three occasions, May 13, 23 and 28, 1986. On the observation sheets he also made certain recommendations for improvement: some students were working on something else, one was reading a poem, and arrangement of bookshelves needed improvement (5/13); a student was working on another project, some were chewing gum, and McKenzie needs to move around the room more (5/23). Based on these observations, McKenzie's overall evaluation for the 1985-86 school year was satisfactory. In fact, the "Teacher Performance Evaluation Summary" prepared by Jones and signed by both him and McKenzie, comments:
Mr. McKenzie is a second year teacher. He is becoming an experienced capable teacher. He responds well to suggestions.
Jones recommended McKenzie for continued employment.
During the 1986-87 school year, secondary supervisor Dr. Ray Burnham observed McKenzie once, on October 22, 1986. Dr. Burnham gave an overall rating of "needs improvement," noting that McKenzie's lecture was too brief, he needed to show a positive attitude, he took too long checking homework, and he needed more planning and preparation. Principal Jones also observed McKenzie three times, in November, February and March. Each of these observations listed an overall rating of satisfactory, while noting a need to improve establishing and maintaining classroom control. Jones made his evaluation of McKenzie in May 1987, giving him an overall rating of satisfactory. While still noting a need for McKenzie to control the classroom better and to speak louder, he commented, "Mr. McKenzie has the qualities of a professional."
During the 1987-88 school year, Dr. Burnham observed McKenzie on three occasions, October 13, 1987, February 9 and March 16, 1988. On the first, Dr. Burnham noted that McKenzie needed improvement in establishing and maintaining class control, but felt he was improving in this area. The overall rating on this observation was satisfactory. The February 9 observation carried an overall rating of "needs improvement," specifically referring to lesson planning and using instructional methods and materials in conducting lessons; still, "improvement is noticeable." On March 16, Dr. Burnham again assigned an overall rating of "needs improvement," specifically citing the area of class control, utilization of time, planning instruction, and use of a variety of teaching methods and techniques. Principal Jones also observed McKenzie, on April 25 and May 17, 1988. Both of these resulted in overall ratings of "satisfactory." On May 17, he noted McKenzie needed improvement in maintaining class control. Also, on April 27, Jones conducted his evaluation of McKenzie. This document (referred to as Exhibit M-C) shows Jones assigned McKenzie a satisfactory rating in every category. The overall evaluation rating is ambiguous, however, as Jones checked "needs improvement" and added in handwriting, "in discipline"; his only other comment was, "It is better to use `let's be quiet' than `shut-up.'" The evaluation document considered as a whole shows the overall evaluation to be satisfactory. Any ambiguity must be construed against the School Board who prepared the form and whose agent completed the form. Notably on the subsequent observation (May 17), Jones gave McKenzie an overall "satisfactory" rating. Jones's observation and evaluation forms were given to McKenzie on June 3, 1988, only three days prior to McKenzie receiving notice that his contract would not be renewed. Principal Jones testified that he did not evaluate McKenzie's performance as being "unsatisfactory" in writing because he wanted to encourage him. He obviously did not tell McKenzie at the post-evaluation conference (provided there was one) that his performance was unsatisfactory and that he was recommending that his employment be terminated.
Discussion. The School Board contends that the observations conducted by the supervisors, with the accompanying comments, sufficed as evaluations contemplated by R.S. 17:391.5 and the board's policy for probationary teachers. The majority accepts this erroneous contention by stating that McKenzie was evaluated between August of 1985 and May of 1988 sixteen times. I must disagree. McKenzie was only evaluated three times, once each year, and never received an unsatisfactory *223 rating on any evaluation. The forms clearly indicate whether they are evaluations or observations. The statute and policy clearly envisage at least one annual evaluation by the principal based upon no less than three observations. The annual evaluation, with its overall rating, must be in writing and furnished to the teacher. If the rating is unsatisfactory, the evaluation must specifically so inform him.
With respect to the statutory requirement that written notice be given of unsatisfactory evaluation, a fair reading of R.S. 17:391.5 C shows the statute simply contemplates that the performance of an employee will be either satisfactory or unsatisfactory. It does not contemplate the category of "needs improvement" as employed by the School Board in its observation/evaluation forms as changed in 1986. While the majority apparently would interpret a rating of "needs improvement" as equivalent to unsatisfactory performance under the statute, I come to the opposite conclusion. Because the School Board's evaluation form has a category of "unsatisfactory," I interpret the category of "needs improvement" as simply meaning that while the employee's performance is not unsatisfactory, there are ways in which the employee can better perform that particular skill. Stated differently, a rating of "needs improvement" indicates that the observer or evaluator would like to see the employee improve a specific skill, even though the performance demonstrated at the time of the evaluation was considered satisfactory.
I believe this interpretation is better. A significant purpose behind the statute is to clearly inform an employee of an overall unsatisfactory evaluation in order to thereby put the employee on notice of a problem that ultimately could result in dismissal. Such notice is a fundamental part of any meaningful due process. This is true whether an employee is probationary or permanent. Therefore, any personnel evaluation system that does not clearly communicate to an employee areas of considered unsatisfactory performance does not afford an employee the due process required and is defective.
Assuming that the board, through its agents, considered McKenzie's teaching performance unsatisfactory, no final annual evaluation to this effect was ever made or given in writing to McKenzie. To the contrary, McKenzie never received an unsatisfactory rating, either in a particular area or overall, on any evaluation, or for that matter, on any observation. If in fact, as the annual evaluation showed, McKenzie was performing satisfactorily, the board's termination of his employment was for invalid reasons and not in good faith. Thus the board failed to honor the most fundamental aspect of R.S. 17:391.5 and its own policy. McKenzie was not afforded due process in the evaluation procedure.
The board further contends that the comments and suggestions jotted on the observation forms were effective both as notice to McKenzie of the specific areas of deficient or unsatisfactory performance and as the professional assistance or remediation program contemplated by state law and the board's policy. The majority also erroneously accepts this contention. Again, I disagree. To repeat: the policy mandates that in the event a probationary teacher's performance is evaluated as unsatisfactory, a professional assistance program must be planned by the evaluator or observers (or both) and recorded on a professional assistance program schedule (Form PA-2/3a). This program must meet all the requirements I have summarized above. The School Board admits, however, that this proceduredescribing specific activities for remediation, a time frame for remediation and a fixed date for reevaluationwas not followed. Nothing resembling a schedule was given to McKenzie, signed by both him and the principal, and discussed at the post-evaluation conference.
In my view it is unreasonable to contend that observation forms intended to be utilized in the overall evaluation of a teacher, can be, subsequent to his termination, interpreted as final overall evaluations, professional assistance programs and reevaluations. Such was not the intent of the law.
When this matter was previously before this court we concluded that La.R.S. 17:391.5 applies to probationary teachers. McKenzie *224 v. Webster Parish School Board, 609 So.2d 1028 (La.App. 2d Cir.1992). Therefore, when the reason for termination of a probationary teacher is unsatisfactory performance, that statute and the School Board's policy enacted pursuant thereto must be complied with before dismissal or termination is proper.
The majority's reliance on Harris v. West Carroll Parish School Bd., 605 So.2d 610 (La.App. 2d Cir.), writ denied 609 So.2d 255 (1992), is misplaced. There we held that substantial compliance with the policy established by the School Board for dismissing nontenured school employees was sufficient. Here, there was no substantial compliance. In fact, the Board completely disregarded its evaluation policy.
Conclusions. In summary, I do not view this case as one in which this court has been invited to interfere with discretionary management decisions of the School Board, or to unduly burden the process through which a school system weeds out undesirable personnel. Certainly, school boards must be given a large measure of discretion in such matters. However, a school board can abuse that discretion when it fails to accord an employee the basic procedural due process mandated by law and indicative of fairness. I believe this case involves such an abuse of discretion. McKenzie's employment was wrongfully terminated. I would reverse, reinstate McKenzie and remand for a determination of back pay and benefits due.

APPLICATION FOR REHEARING
Before SEXTON, NORRIS, LINDSAY and HIGHTOWER, JJ. and CULPEPPER, J. Pro Tem.
Rehearing denied.